**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GENERAL MOTORS CORPORATION,**

                **Plaintiff,**

    v.                                        **07-CV-141**

**DEALMAKER, LLC, d/b/a SEAWAY**
**CHEVROLET,**

                **Defendant/**
                **Counterclaimant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

**I. INTRODUCTION**

    Plaintiff General Motors Corporation ("GM" or "Plaintiff") commenced this action against one of its authorized dealerships, DealMaker, LLC, d/b/a Seaway Chevrolet ("Seaway" or "Defendant"), seeking a declaratory judgment that GM was within its contractual rights to reject Defendant's proposed relocation request under the terms of the Dealer Sales and Service Agreement ("Agreement"). See Compl., Ex. "A" [dkt. # 1]. Defendant filed an Answer and Counterclaim asserting various claims against GM. See Ans. [dkt. # 4].[1]  On August 23, 2007, the Court issued a Decision and Order that

---

[1] Seaway also filed a third-party complaint against Davidson Chevrolet Cadillac, Inc. ("Davidson"), a competing General Motors dealership. The claims against Davidson were dismissed by stipulation on September 29, 2008. See Stipulation of Dismissal without Prejudice [dkt. # 62].

1

dismissed the majority of Defendant's counterclaims. See 08/23/07 Dec. & Ord. [dkt. 27]. Familiarity with this Decision and Order is presumed.  Remaining in the case are Plaintiff's declaratory judgment claim and Defendant's counterclaims asserting (1) a breach of the Agreement by GM, and (2) that GM violated § 466(1) of the New York Franchised Motor Vehicle Dealer Act.

Plaintiff and Defendant have cross-moved for summary judgment pursuant to Fed. R. Civ. P. 56, and Defendant has filed a motion *in limine* to preclude Plaintiff from offering expert testimony in this matter.  For the reasons that follow, Plaintiff's motion for summary judgment is granted and Defendant's motions are denied.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . .  the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When considering cross-motions for summary judgment, a court "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc., 996 F.2d at 1461.

**III.  BACKGROUND**

The following facts are taken in the light most favorable to Seaway, the non-movant on GM's motion for summary judgment.  See Hotel Employees & Rest. Employees Union, Local 100 of N.Y., 311 F.3d at 543.

Seaway operates a Chevrolet dealership in Theresa, New York pursuant to the Chevrolet Dealer Sales and Service Agreement ("Agreement") it entered with GM.  GM's L.R. 7.1 Stat. of Mat. Facts ("GM 7.1 Stat.") ¶ 1. [2]  Article 4 of the Agreement addresses the locations of the authorized dealerships within GM's dealer network.   Paragraph 4.1, entitled "Dealer Network Planning," provides as follows:

> Because General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement.  Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced.  As a result, customers, dealers, and General Motors all benefit.
>
> To maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive, to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above.  Such marketing conditions include General Motors sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the ability of General Motors existing dealers to achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

Agreement, ¶ 4.1

---

[2] Seaway had previously operated an Oldsmobile dealership at the same location in accordance with a separate Oldsmobile Dealer Sales and Service Agreement. When the Oldsmobile line of vehicles was discontinued, the Oldsmobile Dealer Agreement was terminated and Seaway was paid $224,368.00 to fully release all claims relating to Oldsmobile and the operation of the Oldsmobile part of the dealership. GM 7.1 Stat. ¶¶ 2-3.

Paragraph 4.4.2 of the Agreement, entitled "Change in Location or Use of Premises," provides:

> If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, **for General Motors['] evaluation and final decision in light of dealer network planning considerations**. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without General Motors['] prior written authorization **pursuant to its business judgment.**

Agreement, ¶ 4.4.2 (emphasis added).

In January 2006, Seaway submitted a request to relocate its dealership from its current site in Theresa, New York to a proposed location in Evans Mills, New York, still within its GM-assigned Area of Primary Responsibility ("APR"). GM hired a consulting firm, Channel Vantage, to perform a market analysis of the current and proposed dealer locations. This yielded a forty-eight page report that contained marketing data on Seaway's current and proposed locations. See GM's 7.1 Stat. ¶¶ 8-10; Seaway's Resp. L. R. 7.1 Stat. ("Seaway's 7.1 Resp.") ¶¶ 8-10.

GM then requested several employees to address Seaway's relocation request. These individuals included Zone Manager Tim Thompson, Dealer Network Regional Manager Paul Bottiglieri, Assistant to the Regional Manager Butch Bunker, Manager of Strategic Market Analysis Richard Stier, and Regional Dealer Organization Manager Mark Szymanski. GM's 7.1 Stat. ¶¶ 11-13, 18; Seaway's Resp. L. R. 7.1 Stat. ¶¶ 11-13, 18. These individuals focused on the proximity of Seaway's proposed relocation site to other pre-existing GM dealerships and the impact that the relocation would have on sales at these other dealerships. GM's 7.1 Stat. ¶¶ 14-17; Seaway's Resp. L. R. 7.1 Stat. ¶¶ 14-

17.  Some of the individuals reviewed the data contained in the Channel Vantage report, and each consulted with the other in the decision-making process.

These employees decided that relocation would be inappropriate due to the negative impact it would have on the overall Chevrolet dealer network and on the sales at dealerships contiguous to the proposed location. GM's 7.1 Stat. ¶¶ 18-20; Seaway's Resp. L. R. 7.1 Stat. ¶¶ 18-20.  In this regard, Paul Bottiglieri testified at deposition as follows:

> Based on a review of the distance changes, approximate similarity to other dealers, based upon the Chevrolet brand penetration in the area, based upon the reduction and expected [*sic*] of several of the dealers, we concluded that the rejection - that the proposal should be rejected.

Bottiglieri Dep. p. 215.   Therefore, on March 30, 2006, GM Zone Manager Tim Thompson sent a letter to Seaway informing Seaway that its relocation request was denied. See Def. Ex. 6 [dkt. # 63].  This litigation followed.

**IV.  DISCUSSION**

    **a.  Contact Interpretation**

GM asserts that it complied with its contractual obligation under the Agreement to review Seaway's relocation request and to make a determination based on its business judgment consistent with the Dealer Network Planning provision in the Agreement. Seaway contends that GM breached the Agreement by making a determination that was not based on a proper analysis and that was contrary to Seaway's business interests.

By virtue of the choice of law provision in the Agreement, the contract is interpreted using Michigan law. See Agreement, ¶ 17.12; see also Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("[A]s a general rule, choice of law provisions . . . are valid and enforceable in New York."); Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 116 F.2d

675, 676 (2d Cir. 1940) (applying Michigan law to interpret a contract between a New York automotive dealer and a manufacturer which had a Michigan choice of law provision). Michigan law recognizes that "contracts are enforced according to their terms," and that unambiguous contractual provisions will be given their "plain and ordinary meanings." Coates v. Bastian Brothers, Inc. 276 Mich. App. 498, 503 (Mich. Ct. App. 2007), appeal denied, 480 Mich. 1193 (2008). Generally, a contract will be enforced as written, and a court may interpret its meaning as a matter of law. Id. Only when language in a contract is ambiguous (*e.g.*, when it is susceptible to multiple meanings) does the contract's meaning become a question of fact. Id. at 503-04; see Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157-58 (2d Cir. 2000).[3]

The Agreement's language is unambiguous. Compagnie Financiere de CIC et de L'Union Europeenne, 232 F.3d at 157. GM's business judgment, based on an evaluation of dealer network planning considerations, is controlling on dealer relocation requests. See Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 874 (5th Cir.

---

[3]The Second Circuit wrote in Compagnie Financiere de CIC et de L'Union Europeenne:

> The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous. The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement. Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder, the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary. A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.

232 F.3d at 157-58.

1989)(deferring to "unmistakably expressed" contractual language authorizing General Motors to "approve or disapprove" dealer relocation); see also Love Pontiac, Cadillac, Buick, GMC Truck, Inc. v. General Motors Corp., 173 F.3d 851, 1999 WL 125562, at *3 (4th Cir. Mar. 10, 1999) (unpublished decision)("The terms of the contract leave no ambiguities as to [GM Truck's] discretion to establish additional dealerships and alter a dealer's APR. While the contract provides that such decisions should be made only after analyzing network planning considerations, those considerations include many factors in addition to plaintiff's best interests. The contract provides that notice and opportunity be given plaintiff, but the final decision is left solely in GMC Truck's discretion, 'pursuant to its business judgment.'").

Given the deference afforded to corporations that contractually reserve to themselves the discretion to make decisions based on their business judgment, attacks on the methodology used, or the conclusion reached, are generally of little significance. See Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1576 (2d Cir. 1994) (recognizing the discretionary nature of an entity's business judgment); Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 106 (2d Cir. 1989)(Because courts are not suited to make business decisions, a court should not substitute its own judgment for that of a business.); see also Clair Int'l., Inc. v. Mercedes-Benz of N. America, 124 F.3d 314, 317 (1st Cir. 1997) (finding a franchisor's decision to award a franchise to be within its "broad and exclusive" business judgment discretion conferred by agreement); Olympic Chevrolet, Inc. v. Gen. Motors Corp., 959 F. Supp. 918, 923 (N.D. Ill. 1997) (ruling that no issue of fact existed as to whether General Motors breached the Dealer Agreement because the Agreement vested General Motors with business discretion);  Love Pontiac, 1999 WL

125562, at * 2 (Upholding grant of summary judgment dismissing breach of contract claim where "[d]efendants provided sound business judgment reasons for both the decision to award the Hilton Head franchise to Heritage rather than Love and the decision to diminish Love's APR."). The pertinent question here is not whether GM's decision was properly supported, but whether GM exercised reasonable business judgment in the context of network planning considerations in arriving at its decision to reject Seaway's relocation request. The undisputed facts establish that it did exercise its discretion in accordance with the terms of the Agreement.

GM engaged an outside vendor to prepare a marketing report tailored to the specific relocation issue, and then had experienced network development personnel review the report and address the question of whether the relocation would be beneficial to GM's network of dealers. GM took into account the impact that the requested relocation would have on Seaway and other the dealers in the network. Although Seaway does not agree with the result, it has not established sufficient grounds upon which a fair-minded trier of fact could conclude that GM failed to use reasonable business judgment based on network planning considerations when it denied Seaway's relocation request. Hence, no reasonable fact finder could conclude that GM breached its obligation under the Agreement when it reviewed, and denied, the relocation request.

The denial of the relocation request also did not amount to a breach of Seaway's asserted contractual right to "achieve a reasonable return on investment." See Agreement, ¶ 4.1; Love Pontiac, 1999 WL 125562, at *2. The language of the Agreement clearly and unambiguously predicates each dealer's right to "achieve a reasonable return on investment" on compliance with GM's dealer network planning considerations.

Agreement ¶ 4.1.  The clear intent of this provision is to reinforce the contractual principle that each dealer is a part of a network, and that at times a dealer's economic interests might be subordinated to those of other dealers in the network. See Robert Basil Motors, Inc. v. General Motors Corp., 2004 WL 1125164, at * 6  (W.D.N.Y. Apr. 17, 2004).[4]  The terms of ¶ 4.1 of the Agreement create no ambiguity as to the discretion reserved to GM to exercise its business judgment based upon network planning considerations in addressing a relocation request, and the paragraph does not create a dealer's right to override GM's decision that is based on these considerations. See Bright Bay GMC Truck, Inc. v. General Motors Corp., 593  F. Supp.2d 495, 499-500 (E.D.N.Y. 2009)(relocation request dependent upon ability of preexisting network dealers to earn a reasonable return on their investment).

GM has demonstrated its entitlement to summary judgment on the claim that it was within its contractual rights to reject Defendant's proposed relocation request, and no material question of fact exists as to whether GM breached the contract as Seaway

---

[4] Interpreting an identical paragraph, the Western District of New York wrote in Robert Basil:

> The Court finds that [§ 4.1 of the Sales & Service Agreement], which comes under the heading "Dealer Network Planning" to be unambiguous. This "Dealer Network Planning" article of the Sales & Service Agreement clearly delineates the respective responsibilities of the contract parties as they relate to the planning of GM's dealer network. As an inducement to entering into a franchisee relationship with GM, GM is obligating itself to limit the number and location of its dealers, while Basil, in response to this inducement, is obligating itself to have proper facilities to represent and service GM products. The phrase "to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement" would lose meaning if it applied merely to the franchisees' need for proper facilities. The ability of a franchisee to achieve a reasonable return on its investment is very much dependant upon the number and location of such dealerships. . . . Although the language of this section is clearly not a guarantee of success, this provision just as clearly does impose some obligations upon GM in planning its dealer network to permit Basil an opportunity to achieve a reasonable return on its investment.

2004 WL 1125164, at * 6.

asserts. Accordingly, GM's motion for summary judgment on its declaratory judgment claim [dkt. # 65] is granted.

### b. New York Franchised Motor Vehicle Dealer Act

Plaintiff also moves for summary judgment dismissing Seaway's counterclaim contending that GM violated § 466(1) of New York Franchised Motor Vehicle Dealer Act ("FMVDA"). Section 466(1) provides:

> It shall be unlawful for a franchisor directly or indirectly to impose unreasonable restrictions on the franchised motor vehicle dealer relative to transfer, sale, right to renew or termination of a franchise, discipline, noncompetition covenants, site-control (whether by sublease, collateral pledge of lease or otherwise), right of first refusal to purchase, option to purchase, compliance with subjective standards and assertion of legal or equitable rights with respect to its franchise or dealership.

N.Y. Veh. and Traf. Law § 466(1).

Seaway contends that GM violated § 466(1) because, "by its actions," "GM has directly or indirectly attempted to impose or imposed, and in bad faith, unreasonable restrictions on [Seaway] relative to site-control and/or [Seaway's] assertion of its legal rights to seek to relocate." Counterclaim ¶ 58. On the motion to dismiss this counterclaim, GM argued that the term "site-control" in § 466(1) contemplates only a manufacturer's restraint on the actual premises of a dealership, such as a "sublease" or a "collateral pledge of lease," but did not encompass the dealer site relocation. Impliedly finding the term "site-control" to be ambiguous in this regard, the Court previously held that Seaway asserted "a plausible claim that GM violated FMVDA § 466(1)." 8/23/07 Dec. & Ord. p. 11.

On the instant motion, GM again argues that the term "site-control" as used in § 466(1) does not does encompass dealer site relocation. In support of this argument, GM

10

cites to the August 2008 amendments to the FMVDA wherein the New York State Legislature added, *inter alia,* § 463(2)(dd) to the FMDVA.  Section 463(2)(dd) makes it an unlawful practice for a franchisor to "unreasonably prevent or refuse to approve the relocation of a dealership to another site within that dealership's relevant market area." N.Y. Veh. and Traf. Law  § 463(2)(dd).  The language of this amendment makes clear that when the New York State Legislature intends to address the issue of dealer site relocation in the FMDVA, it speaks in clear and unambiguous terms.  Under the often-cited canon of interpretive construction *inclusio unius est exclusio alterius* (the inclusion of one is the exclusion of another), Uribe v. Merchants Bank of N.Y., 91 N.Y.2d 336, 340 (N.Y. 1998), it is clear that the term "site-control" as used in § 466(1) of the FMVDA was not intended by the New York Legislature to reach the issue of dealer site relocation. Had the New York Legislature intended § 466(1) to reach the issue of dealer site relocation, it would have used the term "relocation of a dealership" as it did in  § 463(2)(dd).  Consequently, the Court concludes that § 466(1) of the FMVDA does not provide a legal basis for recovery on Seaway's counterclaim asserting wrongful denial of its site relocation request. Therefore, GM's motion in this regard is granted, and the counterclaim is dismissed.  The Court need not reach GM's alternative basis for this portion of its motion.[5]

### c.  Seaway's Motions

For the reasons discussed above, Seaway's motion seeking summary judgment on its breach of contract and FMVDA § 466(1) claims [dkt. # 63] is denied.  Seaway's motion *in limine* [dkt. # 64] is denied as moot.

---

[5] GM argues that, assuming the statute does reach relocation issues, there is insufficient evidence that GM imposed an unreasonable restriction on Seaway's site control.

11

### III. CONCLUSION

Plaintiff General Motors's motion for summary judgment [dkt. # 65] is **GRANTED**, Defendant Seaway's motion for summary judgment [dkt. # 63] is **DENIED**, and Defendant Seaway's motion *in limine* [dkt. # 64] is **DENIED AS MOOT**.

Within ten (10) business days of the date of this Decision and Order, General Motors shall submit, on notice to Defendant Seaway, a proposed judgment. Seaway shall than have ten (10) business days to lodge objections, if any, to the proposed judgment.

**IT IS SO ORDERED**

DATED:May 8, 2009

*[signature]*
Thomas J. McAvoy
Senior, U.S. District Judge